IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2024 Session

**STATE OF TENNESSEE v. PHILLIP JEROME LOCKE**

**Appeal from the Criminal Court for Knox County**
No. 112273      Steven Wayne Sword, Judge

_____

**No. E2022-01676-CCA-R3-CD**
_____

A Knox County jury convicted the Defendant of first degree premeditated murder, felony murder, especially aggravated robbery, carjacking, unlawful possession of a firearm as a convicted felon, unlawful possession of a handgun as a convicted felon, and the lesser included offense of possession of a firearm during the commission of a dangerous felony. The trial court imposed an effective sentence of life plus thirty years. On appeal, the Defendant asserts that: (1) the trial court erred when it failed to give an accomplice jury instruction for a witness, Duraejia Clark; (2) the convicting evidence is insufficient because the State failed to corroborate the accomplice's testimony; and (3) cumulative error requires reversal. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TIMOTHY L. EASTER, J., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Phillip Jerome Locke.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the shooting death of Diondus Billings ("the victim"). Prior to the victim's death, the Defendant's brother was killed and the Defendant believed the victim had something to do with it. On the night of the offense, the Defendant set up a ruse to meet the victim. This involved Cindy Green, someone who regularly purchased drugs from the victim, calling the victim and arranging a drug buy. Instead of Ms. Green, the

Defendant appeared, asked the victim for a ride, and the victim agreed. In the victim's car was the victim's friend, Duraejia Clark. Shortly thereafter, the Defendant shot the victim. For his role in these offenses, a Knox County grand jury indicted the Defendant for first degree murder, felony murder, especially aggravated robbery, carjacking, employing a firearm during a dangerous felony as a convicted felon, unlawful possession of a firearm as a convicted felon, and unlawful possession of a handgun as a convicted felon.

At trial, the parties presented the following evidence: Zackea Harris had been dating the victim for five or six months at the time of his death. On October 29, 2017, the two had spent the day together but, that night, the victim needed to go to his mother's house ("Ivy Avenue house"). The weather had turned cool, and the victim's car heater was not working, so Ms. Harris offered her car to the victim. The victim drove Ms. Harris's maroon 2016 Nissan Maxima ("Maxima") to the Ivy Avenue house at around 8:15 p.m. The victim told Ms. Harris that he would be back soon, but she never saw him again.

Duraejia Clark successfully completed coursework for phlebotomy and medical office information in October 2017. On the night of the offense, she contacted the victim, who was a good friend, to tell him that she had received her certificate for phlebotomy. The two agreed to have dinner together to celebrate her accomplishment, and the victim told Ms. Clark to meet him at the Ivy Avenue house.

The Ivy Avenue house was on a corner between two streets, and Ms. Clark parked on the street to the side of the Ivy Avenue house. The victim, driving the Maxima, arrived around the same time as Ms. Clark. Ms. Clark had never seen the Maxima before, but she joined the victim, sitting in the passenger seat. As they drove away, the victim received a text message and then told Ms. Clark that "[h]e had to go make a play." Ms. Clark understood this to mean that the victim was going to sell drugs. She confirmed that drug dealing was the victim's "business." The victim told Ms. Clark that he had to "go by Kroger's."

The victim drove to the Kroger located on Asheville Highway. Once in the Kroger parking lot, the victim appeared to be "trying to find someone," but Ms. Clark did not know who the victim intended to meet at Kroger. The victim placed a call to the person to whom he planned to sell drugs; however, the potential buyer did not answer the call. The victim left the Kroger parking lot and drove down the street to the parking lot of a restaurant called Jazzy Lynn's located near a laundromat. In the part of Jazzy Lynn's parking lot closest to the laundromat, the victim again tried unsuccessfully to call the potential buyer. As the victim and Ms. Clark sat in the parking lot, they saw a man walking toward them. The victim, recognizing the man, said, "it looks like [the Defendant]."

2

Ms. Clark recalled that she had met the Defendant several months before at "JRoc's" funeral. JRoc[1] was the Defendant's brother and the victim's "best friend." The victim lowered the car window, and the Defendant asked the victim for a ride, explaining that he and his girlfriend had gotten into an argument. The Defendant, dressed in all black, entered the backseat of the car, and the victim drove to the Defendant's mother's residence located at the end of the cul-de-sac on "Robert Huff." Once they arrived, the Defendant told the victim that he did not want to be at his mother's house and asked the victim to drive him to his girlfriend's residence on "the south side." The victim agreed.

As they drove, the Defendant communicated driving directions to the victim. When they arrived, the victim "pulled up at a driveway," but the Defendant instructed the victim to park on the other side of the street. The Defendant told the victim and Ms. Clark that his girlfriend was not yet home but would be soon. He indicated that "there was going to be another argument." As they sat waiting for the Defendant's girlfriend, the Defendant and the victim reminisced about JRoc, sharing photographs and videos of him.

Ms. Clark testified that at JRoc's funeral she had learned that she and the Defendant were cousins. While sitting in the car, Ms. Clark and the Defendant began talking about shared family members and showing one another photographs. The Defendant shared his phone number with Ms. Clark, and she entered his number under the contact name "Cousinnnn." Ms. Clark denied that, at any point during the night, the communication between the parties was confrontational or threatening.

As they waited, Ms. Clark heard a gunshot and immediately thought, due to the earlier fight, that the Defendant's girlfriend had arrived. She ducked down in the car. The Defendant, who was sitting behind Ms. Clark, placed his hand on Ms. Clark's back and instructed her to "stay down." A second shot was fired and Ms. Clark turned her head to the left and saw the victim put the Maxima in drive. She then felt the Maxima slowly move forward before hitting a "community sign." The Defendant exited the Maxima, went to the driver's door, and pulled the victim out of the car.

Ms. Clark gathered her belongings and attempted to flee, but the Defendant told her to get back in the Maxima. The Defendant, holding a gun, sat in the driver's seat, and Ms. Clark sat in the front passenger seat. The Defendant backed up the Maxima, running over the victim, and then drove away. Ms. Clark asked the Defendant if he was going to kill her. The Defendant replied, "no . . . but, if you didn't let me know we was cousins, you would have been dead, too." It was at this point that Ms. Clark determined that she would "[d]o whatever [she could] to survive."

---

[1] Throughout the transcript, the Defendant's brother is only referenced by what appears to be the nickname "JRoc." Although not his given name, we refer to him as such throughout the opinion.

The Defendant drove a distance and stated his intent to set the Maxima on fire. Ms. Clark overheard the Defendant talking on his cell phone about obtaining a gas can. As the Defendant drove his conversation indicated to Ms. Clark that there were others that would "be dropping like flies." He specifically named two people, one was "Tonio," and the other name Ms. Clark could not recall. The Defendant did not provide specific details about why he killed the victim; however, he did say he suspected that the victim had something to do with JRoc's death. The Defendant was angry with the victim and the two other individuals because he believed they were not "doing anything" about his brother's death. He also told Ms. Clark that the house that he had represented as his girlfriend's was not her house.

The Defendant drove to Holston Place Apartments, located near Jazzy Lynn's. The Defendant told Ms. Clark he was going to leave the Maxima there, having abandoned his plan to set the car on fire. Ms. Clark learned that the Defendant had a car parked down the street at Stratford Arms Apartments. The Defendant took her to his car, a black Chrysler 200, and told her to drive to Kroger to buy supplies to clean the Maxima. The Defendant kept Ms. Clark's driver's license and waited at the apartment complex while Ms. Clark drove the short distance to Kroger for the supplies.

Ms. Clark testified that, although she had her cell phone with her, she did not attempt to call anyone or alert anyone at Kroger about the murder. She explained that she did not do so because she was in shock and too scared. Ms. Clark identified still photographs of her and the Chrysler 200 taken from Kroger surveillance footage. Ms. Clark bought the supplies and returned to the Defendant. The Defendant cleaned the Maxima and then drove Ms. Clark to her car parked at the Ivy Avenue house. On the drive, the Defendant told Ms. Clark, if questioned about the night, to deny that she had been with the victim or the Defendant. The Defendant let Ms. Clark out of the black Chrysler 200 a short distance from the Ivy Avenue house, and she walked the remainder of the way to her car. Ms. Clark did not go inside the house and alert the victim's mother. She stated that she "wasn't thinking" and "was too shocked." The Defendant followed Ms. Clark in her car until she drove onto the interstate.

The following day, the Defendant sent a text message to Ms. Clark. The text message read, "hey, or what's up?" Ms. Clark did not respond. She had received no further communication from the Defendant after that message.

Later, Ms. Clark was interviewed at the police department. Initially, she lied as instructed by the Defendant, telling the detective that she had not been with the victim on the night he was killed.

4

In 2017, Cindy Ruth Green lived with her boyfriend, William Bell, on Wooddale Road in Knoxville, Tennessee. The relationship ended when she relapsed using crack cocaine. Ms. Green identified crack cocaine as her drug of choice, saying that, while using crack cocaine, she had done things she regretted, notably stealing.

Ms. Green met JRoc through his aunt, Cassie Bush. Ms. Green considered JRoc a friend but also bought crack cocaine from him. Ms. Green described herself as a weekly user during this time. JRoc introduced her to the victim, who also sold her crack cocaine, and the Defendant, who delivered crack cocaine to Ms. Green. Ms. Green contacted JRoc, the victim, and the Defendant about crack cocaine by phone call or text.

Ms. Green attended a moonlight service for JRoc following his death and considered herself close to the family because of her relationship with Cassie Bush. Following JRoc's death, the Defendant told Ms. Green that he and the victim were not speaking and that the Defendant wanted to meet with the victim to try to resolve their differences. The Defendant told Ms. Clark that he did not think the victim killed JRoc, but he suspected that the victim either knew about it or had something to do with it. The Defendant asked Ms. Green to call the victim and arrange a fake drug deal. He wanted Ms. Green to arrange a meeting with the victim to buy drugs but instead the Defendant would be at the agreed upon location. The Defendant told Ms. Green that he would give her some crack cocaine if she set up this meeting.

On October 29, 2017, Ms. Green contacted the victim via text messaging and arranged for the victim to sell her drugs. Ms. Green admitted that she was initially dishonest in her statement to the police. Ms. Green identified text messages exchanged between she and the Defendant. The first, dated October 29 at 12:33 p.m., was from the Defendant who wrote, "We going to get [the victim] tonight okay and you know I got you." Ms. Green understood this message to mean that the Defendant wanted to meet with the victim that night and that the Defendant would give her crack cocaine to arrange the meeting. The two exchanged several messages about the Defendant delivering crack cocaine to Ms. Green's residence, and then the Defendant instructed Ms. Green to text the victim to meet at the laundromat to sell her $120 worth of drugs. Ms. Green thought the amount was too high based upon her prior interactions with the victim, so she sent a text message to set up the drug exchange but did not use the amount the Defendant instructed. At 9:11 p.m., Ms. Green sent a text message to the Defendant stating, "[the victim] will be there in 30 minutes." At 9:18 p.m., Ms. Green sent a text message, in all caps, that read, "You better text me afterwards and let me know u okay. Please be careful." The Defendant responded that he would and instructed Ms. Green to "[e]rase our messages right now."

Ms. Green recalled that the Defendant was "running late" to meet the victim, so she attempted to delay the victim. Ms. Green sent a text to the Defendant stating, "[the victim]

is calling over and over. . . . He may leave." The Defendant sent a text message at 9:51 p.m., instructing Ms. Green to tell the victim that "[the victim] has to wait til 10:30 p.m." Ms. Green responded at 9:55 p.m., "Don't know why the hell he went to Kroger. He said he would go [to the] laundromat." Ms. Green sent multiple messages to the Defendant notifying him that she had messaged the victim that she was "sending Lisa" so it would not seem "fishy" and that Lisa would arrive at 10:30 p.m. Ms. Green explained that she was concerned that the victim might become suspicious due to the delays and change in location.

Ms. Green confirmed that the agreement was that she would receive crack cocaine in exchange for arranging the meeting but clarified that the Defendant never gave her the crack cocaine. She maintained that she believed that the Defendant merely wanted to talk with the victim. Beforehand, Ms. Green considered that the "talk" could become heated resulting in a fight, but she "never thought any farther than that." She agreed that when the police first looked through her phone, there were text messages that had been deleted. She explained that she always deleted her text messages with the Defendant because she was trying to hide her drug use from her boyfriend.

Erica Blair and the victim had been friends for about two years prior to his death. She also knew of the Defendant as JRoc's brother. Ms. Blair and the victim regularly communicated, seeing one another two or three times a week. Upon learning of the victim's death, she contacted his family. Ms. Blair identified a photograph of a text message exchange between her and the victim in the hours leading up to his death.

On October 29, 2017, the victim sent a message to Ms. Blair at 8:46 p.m. asking, "Where you at." Ms. Blair responded at 10:17 p.m. "Home. You're pop ups are too late for me." She explained that his showing up at the last minute was too late and that she was going to bed. The victim responded at 10:23 p.m. "Had to drop Phil off." Ms. Blair believed that the "Phil" referenced in the text message referred to the victim's best friend's brother, the Defendant. At 10:26 p.m., Ms. Blair responded, "You play all day. You tell me anything." Ms. Blair explained that this meant that the victim would tell her "anything" and that she was going to bed. This was her last communication with the victim. The following morning she learned that he had been killed.

Shaniquia Robinson, the Defendant's girlfriend, lived on Joe Lewis Road in South Knoxville with her mother, sister, and the Defendant. Ms. Robinson owned a black Chrysler 200 that the Defendant regularly drove. Ms. Robinson was aware of the Defendant's brother's death and described the Defendant as "broken up" about it. Ms. Robinson identified a photograph of her black Chrysler 200. Ms. Robinson recalled that on the night of October 29, 2017, she was at home. She did not know where the Defendant or her car was that night.

Johnny Johnson lived at the corner of East Moody Avenue and Baker Avenue near Dogwood Elementary in South Knoxville. Mr. Johnson installed a surveillance camera on the east corner of his front porch. The camera captured portions of both Baker Avenue and Moody Avenue.

On the night of October 29, 2017, Mr. Johnson and his wife heard sirens and thought there was likely a car accident on Chapman Highway. As Mr. Johnson prepared to go upstairs, he noticed lights outside. He opened his front door and saw numerous emergency vehicles. As Mr. Johnson stood on his front porch, one of the police officers approached him. Mr. Johnson asked what had occurred and wondered aloud if his surveillance camera had picked up any of "the commotion." He provided the police with the relevant October 29, 2017 surveillance video footage.

The State played Mr. Johnson's surveillance video footage for the jury. The video showed a car parked on Baker Avenue at 10:16 p.m. The car moved to the other side of the road and remained stationary until 10:29 p.m. when the car slowly moved forward before coming to a stop. A person exited the back seat of the car, pulled something large out of the front driver's door, dropping it to the ground, and got into the driver's seat. The driver backed up the car, running over what appeared to be a body, and drove away.

Knoxville Police Department ("KPD") Officer Eric P'Simer responded to Baker and Moody Avenue based upon a report of an unknown person, later identified as the victim, lying in the middle of the street. Officer P'Simer approached the victim to check for vital signs and found none. Officer P'Simer identified photographs of the victim's body as it was found at the crime scene and photographs of tire tracks in the grassy area next to the victim. Police officers collected a cell phone, a cell phone case, and a white hat in the area around the victim. Inside the victim's pockets, police officers found another cell phone, cash, and a set of keys.

On October 30, 2019, KPD Officer Russell Whitfield photographed the Maxima where it had been abandoned on Holston Court in an apartment complex. Officer Whitfield observed blood inside the Maxima and on the outside driver's door window. Most of the driver's door window was gone, but there was blood on the remaining glass. Officer Whitfield found packaging for Ritz cleaning cloths in the driver's seat. He recalled that it appeared to him that the car had been "wiped down by something." In the front passenger seat, Officer Whitfield found two spent 9-millimeter shell cases on the left side of the front passenger seat and one spent 9-millimeter shell case in the rear back seat.

Through Officer Whitfield, the State introduced photographs of the Maxima. One photograph of the driver side door showed white dirt/dust on a portion of the door while

another portion that included the door handle appeared to be wiped clean absent the white dirt/dust. Officer Whitfield also photographed the vehicle registration. The registered owner of the Maxima was Zackea Harris.

Officer Whitfield was able to recover only a couple of prints from the Maxima. One of the latent fingerprints was the victim's right ring fingerprint and the other was Duraejia Clark's fingerprint. Officer Whitfield confirmed that wiping a surface with a cloth would compromise the ability to lift a latent print.

Kroger employee Tiffany Ward worked as the District Asset Protection Manager. In this position, Ms. Ward was the record keeper of video, documents, inventory, shrink research and assisted in prosecution of shoplifters. Ms. Ward provided the police with video evidence recorded at the Kroger on Asheville Highway.

The State showed the jury various "still shots" taken from the surveillance video. The first still photograph was captured at 11:25 p.m. on October 29, 2017. A black car that looked like Ms. Robinson's car entered the Kroger parking lot. The next photograph showed Ms. Clark entering the Kroger and then buying items at the self-check-out. The last still photograph from the video showed Ms. Clark exiting the Kroger at 11:32 p.m. Based upon the Kroger sales system, Ms. Ward could track a particular UPC on a product to confirm the purchaser. The State provided Ms. Ward with Ritz cleaning cloth packaging recovered from the Maxima. Ms. Ward used the Kroger sales system to confirm that the Ritz cleaning cloth package found in the Maxima had been purchased by Ms. Clark on the night of October 29, 2017. The surveillance video showed Ms. Clark leaving the Kroger, entering the same black car she arrived in, and driving away.

On October 31, 2017, KPD Officer Todd MacFaun was looking for the Defendant related to a probation violation warrant. Officer MacFaun observed a black vehicle on Joe Lewis in South Knoxville. The car matched the description of the car the police believed the Defendant would be driving. Officer MacFaun initiated a traffic stop. The black car stopped briefly and then drove away beginning a "lengthy pursuit" that went from south of UT Medical Center to Interstate 40 west to Interstate 640. The police pursued the Defendant until the car came to a stop off of Gap Road. The Defendant exited the passenger side of the car and threw an object to his right and then walked around the front of the car to the driver's side. Police searched the area where the Defendant had thrown the object and found an Alcatel black smartphone.

KPD Investigator Philip Jinks conducted a forensic examination of four of the six cell phones collected in this case.[2] Investigator Jinks examined: (1) an Alcatel phone collected at the scene of the Defendant's arrest; (2) an iPhone confiscated from the Defendant at the time of his arrest; (3) Cindy Green's cell phone; and (4) one of the two cell phones collected at the crime scene. Investigator Jinks explained that he was unable to access information from the cell phone recovered near the victim's body at the crime scene and, thus, KPD sent the cell phone to the Tennessee Bureau of Investigation ("TBI") for further examination. The TBI was also unable to access any information from the cell phone.

Investigator Jinks performed an extraction of the cell phone Ms. Green had provided to KPD and found nothing of any evidentiary value. He said that there were no messages extracted but "some" photographs. Investigator Jinks said that, based on the type of extraction (a logical extraction) he conducted and the type of phone, he would have been unable to recover any deleted content stored in unallocated space on the cell phone.

Investigator Jinks conducted a forensic examination of an iPhone found on the victim at the crime scene and extracted the GPS location data. Investigator Jinks identified a report for the October 29, 2017 location data for the phone between the times of 8:59 p.m. and 11:42 p.m. Based upon the location data, Investigator Jinks developed the following timeline:

| | |
|---|---|
| 9:00 - 9:19 p.m. | Zackea Harris's house |
| 9:33 - 9:41 p.m. | Ivy Avenue residence |
| 9:44 - 9:46 p.m. | Jazzy Lynn's |
| 9:47 - 9:52 p.m. | Kroger |
| 9:53 - 9:59 p.m. | Moving toward Robert Huff residence |
| 10:00 - 10:04 p.m. | Defendant's Mother's Robert Huff residence |
| 10:05 - 10:13 p.m. | Moving toward South Knoxville |
| 10:14 p.m. | Baker/Moody Avenue |

Investigator Jinks extracted information from both phones associated with the Defendant: (1) the Alcatel phone found in the area near where the Defendant exited the car; and (2) the iPhone found on his person. The iPhone extraction revealed an image of Duraejia Clark that appeared to be a screenshot from Facebook taken on October 21, 2017, at 7:15 a.m. The file path name was "Phillip's iPhone."

---

[2] Police confiscated six phones total; however, only five of the phones were retained as evidence. The sixth phone was returned to a witness, Duraejia Clark.

Investigator Jinks explained that the timeline report he generated for the Defendant's iPhone listed every process that occurred on the phone chronologically. Investigator Jinks filtered processes involving messages with the contact name "D.B." The last contact on the Defendant's phone related to D.B. was October 24, 2017. The message was from D.B. to the Defendant and read, "Kendrick, two-door Pontiac, gray, tag number on the pic" and the message contained a photograph.

Investigator Jinks identified a cell site report of the cell towers the Alcatel phone communicated with between October 22, 2017, at 11:07 a.m. and November 1, 2017, at 9:19 a.m. During the period of time from 9:03 p.m. to 11:58 p.m. on October 29, 2017, the Alcatel phone data showed there was no communication between the phone and any cell tower. The extracted data also showed no GPS location for the phone between the same period of time. The last cell tower access was at 9:03 p.m. in the area of Prosser Road in east Knoxville, near the Asheville Highway Kroger. The next communication occurred at 11:58 p.m. and the cell tower was located in the Marble City area of west Knoxville.

Investigator Jinks identified an extraction report of image data files on the Alcatel phone. One such photograph was of Holston Place Apartments. The next was a screenshot of a Google search box that read, "Does Dogwood Elemen-". The next screenshot was of a Google search box that read, "Which schools in south K." The next screenshot showed the Google search box with "Do Holston Court Apartments have cameras" and the search results for the search. The final image was of Duraejia Clark. The data extracted indicated that the images were created on October 30, 2017, 1:17 a.m.

Investigator Jinks generated a report of MMS messages extracted from the Alcatel cell phone. One of the last messages, dated October 31, 2017 at 12:55 p.m. was an outgoing message containing a photograph of Duraejia Clark with the message, "Do you know her?"

Investigator Jinks identified SMS messages retrieved from the Alcatel phone between the Defendant's phone and Ms. Green's phone about which Ms. Green had previously testified.

Investigator Jinks confirmed that he recovered a message communication between the Defendant and the victim on the night of the shooting. The message was contained in "chats," and, at 9:54 p.m,, the victim sent the Defendant a contact card. According to the GPS location data retrieved from the victim's phone, this was around the time that the victim was leaving Kroger and driving toward the Robert Huff residence.

The lead investigator assigned to this case, KPD Officer Tim Riddle, testified about the progression of the investigation of the victim's death. At around 10:30 p.m., Officer Riddle was alerted on the police radio of a shooting victim at the corner of East Moody

Avenue and Baker Avenue. When he arrived, officers had locked down the scene, and crime scene technicians were collecting evidence while other officers canvassed the neighborhood for possible witnesses.

While canvassing neighbors, the police spoke with Mr. Johnson who provided surveillance footage. The police did not find any weapons or shell casings at the scene, only what appeared to be the victim's personal belongings. Mr. Johnson's surveillance video footage, however, showed several flashes consistent with muzzle flashes that occur when a gun is fired and, at the scene, Officer Riddle had observed what he believed to be gunshot wounds to the victim's head. Mr. Johnson's surveillance video footage also showed a car leaving the scene. Based upon the surveillance video footage, police officers believed the vehicle was either a Nissan Maxima or Altima.

Initially, police officers did not know the identity of the victim but Officer Riddle learned the victim's identity that night and notified the victim's mother at the Ivy Avenue house. Through the victim's mother, Officer Riddle learned that the victim's girlfriend, Zackea Harris, drove a maroon Nissan Maxima. The victim's parents did not know Ms. Harris's address, so Officer Riddle returned to the police station and accessed her information through a police department data base.

Officer Riddle interviewed Ms. Harris at her residence and confirmed that her Maxima was missing. Officer Riddle entered the Maxima into NCIC as stolen in order to notify officers in case of a traffic stop involving the Maxima. The following day he was notified of a "suspicious vehicle" located on Holston Court. The front driver's side window was "blown out" and the driver's side door had been left ajar. Inside the Maxima were shell casings and blood. Officer Riddle noted that it appeared that the driver's side door had been wiped down. A Crime Scene Technician collected a Ritz cleaning cloth wrapper from inside the car.

Officer Riddle assigned Investigator Day the task of searching local stores for the Ritz cleaning cloths. Walmart did not carry the Ritz brand, so the police proceeded to Kroger and found a match. From there they obtained surveillance video.

Officer Riddle continued to talk with the victim's family throughout the day and learned that the victim had sent a text message to Ms. Blair that read, "Had to drop Phil off," alerting Officer Riddle to a potential suspect. A review of the Kroger surveillance video showed a woman driving a black Chrysler, entering Kroger, and buying cleaning supplies. Officer Riddle redacted a still photograph and showed the photograph to the victim's family, who identified the woman as Ms. Clark. The Criminal Justice Portal database showed that Ms. Clark owned a silver or gray Nissan Maxima inconsistent with

the car in the Kroger video. Upon further investigation, he obtained a residential address for Ms. Clark.

Officer Riddle recalled that Ms. Clark was not initially truthful in her police interview. He described this as "pretty common." Officer Riddle showed Ms. Clark the Kroger surveillance video and told her that she could be either a suspect or a witness. He told her that at that point in the investigation, it appeared that she was an accessory after the fact. Ms. Clark asked Officer Riddle if he could protect her and then told him what had occurred consistent with her trial testimony. According to Officer Riddle, Ms. Clark cooperated with the investigation by providing a DNA sample and by allowing Officer Riddle to look through her cell phone. Police officers were able to corroborate portions of Ms. Clark's statement to Officer Riddle. Ms. Clark's cell phone contained the phone number for the Alcatel phone recovered at the Defendant's arrest. Ms. Clark told Officer Riddle that she had no communication with the Defendant after the 29th and the phone extraction confirmed her assertion. Likewise, the phone extraction confirmed her communication with the victim.

Now that Officer Riddle had the Defendant's name, he learned the Defendant's girlfriend's residential address in south Knoxville. Officer Riddle established surveillance of the home and, on October 31, 2017, undercover officers observed Ms. Robinson and the Defendant get into a car and leave. Ms. Robinson was the driver of the black Chrysler 200, and police conducted a traffic stop. Ms. Robinson was arrested with the Defendant based upon her flight from the traffic stop.

Officer Riddle took possession of the Alcatel phone recovered at the scene of the Defendant's arrest during his interview of the Defendant. Officer Riddle was not surprised that the Defendant had two phones. He stated that he commonly found people who possessed a "trap phone." He explained that people may have one phone number that they share with family members and then a secondary or "trap phone" that they use for drug sales or if they have multiple girlfriends.

Officer Riddle said the Defendant was cooperative and respectful during the interview; however, the interview was awkward because the Defendant requested to remain standing. Normally, both parties are seated but the Defendant had defecated on himself during the arrest so asked to remain standing. Officer Riddle stated that the Defendant fought officers upon his arrest so police officers used a taser. The Defendant provided Officer Riddle with his cell phone number during the beginning of the interview. This number was associated with the iPhone that was on the Defendant's person at the time of the arrest. Ms. Robinson, who was being interviewed across the hall, provided the Defendant's cell phone number as the number for the Alcatel cell phone.

12

When asked about his location on the night of the 29th, the Defendant told Officer Riddle that he was a loner and "ma[de] plays" by himself. The Defendant indicated that he had been "out doing business." The Defendant explained that he preferred to be alone and that the people he sold drugs to preferred that he be alone. Officer Riddle asked if the Defendant owned a gun. The Defendant confirmed that he owned a 9-millimeter gun but said that he did not usually carry it. The Defendant denied being with the victim on the night of the shooting. The Defendant consented to a search of his iPhone and provided DNA. After Officer Riddle collected the buccal swab for DNA testing, the Defendant told Officer Riddle that he had been with the victim in the Maxima at some point but not the night of the shooting.

KPD sent the DNA evidence collected from the crime scene and the Maxima to the Tennessee Bureau of Investigation for analysis, and the results were inconclusive.

Officer Riddle confirmed that police interviewed Duraejia Clark on October 30, 2017, Shaniquia Robinson and the Defendant on October 31, 2017, and Cindy Green on November 3, 2017. Officer Riddle identified photographs of the black Chrysler 200, taken during processing on November 2 or 3, 2017. Inside the vehicle, police found the Defendant's identification in the center console area and a commemorative bulletin for JRoc wedged in the front windshield.

The State played a portion of the Defendant's October 31, 2017 police interview. Officer Riddle returned to the interview room with the Alcatel phone and asked the Defendant about his ownership of the phone. Officer Riddle took DNA swabs of the Defendant's mouth but then left the swabs on the table. The video recording showed the Defendant, who was alone in the interview room at the time, go over to the table where the swabs were lying, and bend over the swabs, lowering his face close to the table. The sound of paper tearing and crinkling can be heard through the audio, the Defendant can be seen standing and walking away from the table, and the swabs were no longer on the table.

A deputy state medical examiner, Amy Hawes, testified as an expert in forensic pathology. Dr. Hawes conducted the victim's autopsy on October 30, 2017. The victim sustained three gunshot wounds to the right side of his head, one of which was fatal causing rapid death. Based upon the gunpowder stippling, Dr. Hawes estimated that the gun was a few inches to a couple of feet away from the victim when fired. Dr. Hawes observed black marks on the victim's pants as well as abrasions and contusions on the victim that were consistent with the victim having been run over by a vehicle. The postmortem toxicology report was negative for the presence of alcohol and drugs.

The parties stipulated that on October 29, 2017, the Defendant had a prior qualifying conviction that prohibited him from possessing a firearm or handgun.

13

After hearing this evidence, the jury convicted the Defendant of first degree murder, felony murder, especially aggravated robbery, carjacking, unlawful possession of a firearm as a convicted felon, unlawful possession of a handgun as a convicted felon, and the lesser included offense of possession of a firearm during the commission of a dangerous felony. The trial court imposed an effective sentence of life plus thirty years. It is from these judgments that the Defendant appeals.

## I. Analysis

On appeal, the Defendant argues that: (1) the trial court erred when it failed to give an accomplice jury instruction for Duraejia Clark; (2) the convicting evidence is insufficient because the State failed to corroborate accomplice testimony; and (3) cumulative error requires reversal.

## A. Accomplice Testimony

The Defendant contends that the trial court committed error when it failed to give an accomplice jury instruction for Duraejia Clark because the trial testimony raised the inference that she was an accomplice to the victim's murder. The State responds that the trial court properly instructed the jury. We agree with the State.

At trial, when the parties reviewed jury instructions, the trial court considered accomplices. The trial court stated:

> The Court thinks that there's sufficient evidence that Cindy Green could be charged as [criminally responsible] for the conduct of another, because even though she said that she thought they were just going to talk, I think the proof does fairly raise the issue on whether or not she knew that there was going to be something more, because she said, I got worried and thought, what if things went south? And so I think it's reasonable to argue that Cindy Green could be indicted with this.
>
> I don't think that applies to Duraejia Clark. Even though she could be indicted with accessory after the fact, there hasn't been any evidence that could establish that she participated in the killing itself. So I don't think she could be an accomplice, but I do think Cindy Green could be.

The Defendant argued that Ms. Clark was in the car at the time of the shooting and participated in steps to cover up the murder by driving to Kroger for cleaning supplies. The State responded that Ms. Clark testified that she was shocked and afraid and that she was

14

taken by surprise by the events of that night. The trial court then considered that Ms. Clark never drove the victim's car and that she initially lied to the police. Ultimately, however, the trial court concluded Ms. Clark was not an accomplice because she did not knowingly and voluntarily participate with the Defendant in the commission of the murder, carjacking, and robbery.

At the time of these crimes, it was well settled in Tennessee that a conviction may not be based upon the uncorroborated testimony of an accomplice. *See State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). [3] An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). Neither guilty knowledge nor participation in a related but distinct crime is sufficient to make a witness an accomplice. *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). "Mere presence at the scene of the crime does not make one an accomplice." *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). On the other hand, generally, a common test is whether the witness could have been indicted for the offense along with the accused. *Monts v. State*, 379 S.W.2d 34, 43 (1968); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). Finally, being an accessory after the fact does not make one an accomplice whose testimony must be corroborated. *Monts*, 379 S.W.2d at 43; *Pennington v. State*, 478 S.W.2d 892, 897 (Tenn. Crim. App. 1971).

The trial court did not err when it did not include Ms. Clark in the accomplice jury instruction. The record reveals that on October 29, Ms. Clark met the victim to go to dinner to celebrate an academic accomplishment. The evening did not go as planned when the victim agreed to drive the Defendant to his girlfriend's house. The Defendant directed the victim to drive to a location in south Knoxville where he shot and killed the victim. Ms. Clark attempted to flee, but the Defendant instructed her to get back in the Maxima. Ms. Clark asked the Defendant if he planned to kill her, and he responded that their familial relationship saved her from being shot and killed.

After witnessing the shooting of her friend sitting in the driver's seat next to her, Ms. Clark, shocked and afraid, complied with the Defendant's instructions to buy cleaning supplies to wipe down the Maxima. Ms. Clark drove the Defendant's car to Kroger, bought supplies, and returned. The Defendant wiped down the Maxima. There was no evidence at trial that Ms. Clark participated in planning or killing the victim. At most, the evidence showed that Ms. Clark could have been charged as an accessory after the fact. As noted

---

[3] Our supreme court recently issued an opinion abolishing the common law rule that required testimony of a criminal defendant's accomplice to be supported by other evidence. *State v. Thomas,* 2024 WL 979852 (Tenn. 2024); however, we still consider the corroboration of accomplice testimony because the court held that "the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after the date of the mandate." *Id.* at 13.

earlier, an accessory after the fact is not subject to indictment for the offense committed by his or her principal, therefore, he or she cannot be considered as an accomplice within the rule requiring that the testimony of an accomplice be corroborated. *See State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Accordingly, the Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant contends that there is insufficient evidence to support his convictions because the testimony of Ms. Green and Ms. Clark was uncorroborated. The State responds that there was sufficient evidence to support the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

*State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant does not argue with respect to the elements of the offenses for which he was convicted, instead, he narrows his challenge to attacking the accomplice's testimony as uncorroborated. As discussed previously, Duraejia Clark was not an accomplice and, therefore, her testimony does not require corroboration. Thus, we consider whether or not the State sufficiently corroborated Ms. Green's testimony.

The law in Tennessee regarding the corroboration required for accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn. Crim. App. 1971).

Ms. Green testified primarily about her role in arranging a meeting between the Defendant and the victim. Ms. Green was aware that she was tricking the victim into meeting with the Defendant but was willing to do so in exchange for crack cocaine. Ms. Green testified that she communicated with the Defendant on the night of the murder and that she had deleted the text messages per the Defendant's request. The text messages were recovered during a forensic extraction of the Defendant's phone and corroborated Ms. Green's testimony. The Defendant sent a text message on October 29, 2017, that read, "We going to get [the victim] tonight okay and you know I got you." Ms. Green recalled that the Defendant was "running late" to meet the victim so she attempted to delay the victim. Ms. Green texted the Defendant stating, "[the victim] is calling over and over. . . . He may leave." Ms. Clark testified that she and the Defendant initially went to Kroger and then to Jazzy Lynn's searching for the potential buyer. She recalled that the Defendant unsuccessfully called the potential buyer multiple times consistent with Ms. Green's text message to the Defendant referencing the victim's repeated calls.

The Defendant sent a text message at 9:51 p.m., instructing Ms. Green to tell the victim that "[the victim] has to wait til 10:30 p.m." Ms. Green responded at 9:55 p.m., "Don't know why the hell he went to Kroger. He said he would go [sic] laundromat." Ms. Clark testified that the victim initially drove to Kroger and then proceeded to Jazzy Lynn's. She also testified that the Defendant approached the victim's car in the parking lot of Jazzy Lynn's in the same area as the laundromat. The location data extracted from the victim's phone showed his locations were consistent with Ms. Clark's testimony and the text message evidence.

Accordingly, we conclude that Ms. Clark's testimony was sufficiently corroborated by cell phone data extracted from the Defendant's and the victim's respective cell phones. The Defendant is not entitled to relief as to this issue.

### D. Cumulative Error

Lastly, the Defendant contends that the cumulative effect of the errors in this case deprived him of a fair trial. We considered each of the Defendant's issues on appeal and concluded that the trial court did not err. Accordingly, the cumulative error doctrine does not apply. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under

the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____

ROBERT W. WEDEMEYER, JUDGE